Kean v. Johnson et al.

Between John Kean, complainant, and John T. Johnson and others, and the Central Railroad Company, defendants.

1. When a board of directors, or a majority of stockholders, deviate from the originally contemplated undertaking, the "rights" of other and dissenting stockholders are "affected;" as against them they cannot legally do it.

2. A majority of stockholders in a prosperous corporation cannot, at their own mere caprice, sell out the whole source of their emoluments and invest their capital in other enterprises, where the minority desire the prosecution of the business in which they had engaged. The contract is that their joint funds shall, under the care of specified persons, generally called directors, be employed, and that for certain specified purposes.

3. Where the duration of such employment is limited in the charter, until that time it must continue so employed, unless, perhaps, in case of clear loss. If no time is fixed by the charter, at which the proposed use of the capital shall cease, the contract is that so long as the affairs of the company are prosperous it shall go on, unless all consent to the contrary.

4. "How far, under what circumstances, and upon what application a court of equity would restrain a corporation from an improper alienation of its property, must depend upon the general principles which guide it in the exercise of its powers ; but, in a proper case made, it would interfere to prevent a disposition of its property *for other than corporate purposes.*

5. "It is the right of a partner to hold his associates to the specified purposes, whilst the partnership continues."

6. In the enacting section of the charter of a railroad, the words "And they and their successors, by the said name and style, shall be capable of purchasing, holding and *conveying* any lands, tenements, goods and chattles whatever, necessary and expedient to the objects of this incorporation," only authorize property to be sold and conveyed away when it is necessary or expedient to *the objects of the incorporation.* The *objects of the incorporation* cannot require that the necessary source of its profitable existence should be sold and conveyed away.

7. A supplement to the act of incorporation of a railroad company, authorizing the company to purchase the road constructed by another company, and declaring that the purchased road should become a part of the road authorized to be constructed by the charter, contained a proviso, "That nothing *in this act* contained shall in anywise affect *any right whatever,* either at law or in equity, *of any stockholder* or other person in, or any claim or demand against, the company whose road it was contemplated to purchase. *Held,* that the purchase authorized by the supplement did affect the rights of the stockholders in the company whose road was to be purchased ; and that the legislature intended, when they provided that nothing in the act contained should in anywise affect *any right whatever,* that such

purchase should not occur without that which alone could prevent its affecting such rights, viz., the consent of every stockholder.

8. *Quere.* Whether a supplement authorizing any deviation from the original charter, and not requiring the consent of all the stockholders, is unconstitutional ?

9. Where the company whose road was purchased under the above supplement, and who were not a *necessary* party to any of the different *kinds of relief prayed*, had not been made a party to a bill filed by one who was a protesting stockholder, against the directors of both roads, and the company in possession of the road, and all its property but the franchise ; and the objection was not taken until the hearing of a general demurrer to the equity of the bill. The court disposed of the case on its merits, without requiring such formal parties to be joined.

John Kean files his bill in this court against John T. Johnson and others, individuals, and the Somerville and Easton Railroad Company, otherwise called the Central Railroad Company of New Jersey, of which they are directors, praying an injunction and other relief, to which bill the defendants have filed a general demurrer.

The bill states that, under an act of the legislature, passed February 9th, 1831, a corporation was organized, called the Elizabethtown and Somerville Railroad Company, which soon after went into full operation ; that in 1839–40, being in want of funds to pay for the making of the road, the company borrowed large sums of money, for which they mortgaged not only its property but its franchises or chartered rights, which mortgages, by a supplemental act, were validated by the legislature and consent of two-thirds of the stockholders, which consent was by said act required ; that afterwards these mortgages were foreclosed, a sale had, and a deed, conveying all the property and chartered rights of said company, duly made to Stearns & Colket, purchasers at the mortgage sale ; that these purchasers divided the ownership and propriety of their purchase into eight thousand shares of capital stock, one thousand five hundred shares of which the complainant bought, and part of which he still holds ; that under this creation of new stock a new company was organized, a new rail laid over the road, and the business of transporting freight and passengers was begun and carried on with renovated and much increased power and success.

The bill further states that, in 1847, another company was chartered by the legislature to construct a railroad from Somerville to Easton, and called the Somerville and Easton Railroad Company, in which the individual defendants named in the bill (with two exceptions) owned a large majority of the capital stock, and have always been the directors; that, about the latter part of 1848, they combined together for the purpose of amalgamating the two companies under a different organization, and of compelling the other stockholders of the Elizabethtown and Somerville Railroad Company to surrender their stock, and procured the passage of a supplement to the act to incorporate the Somerville and Easton Railroad Company, which is set forth at length in the bill.

The act provides as follows :

1. That it shall be lawful for the Somerville and Easton Railroad Company to purchase the *road* constructed by the Elizabethtown and Somerville company.

2. That, if payment of said purchase can be made in stock, the Somerville and Easton Railroad Company can issue so much as shall be required for that purpose.

3. That the purchased road shall be and become a part of the road authorized to be constructed by the Somerville and Easton company, and regulated by its charter, and that that company shall thereafter be known as the Central Railroad Company of New Jersey.

Provided, that nothing in this act contained shall in any wise affect any right whatever, either at law or in equity, of any stockholder or other person in, or any claim or demand against the Elizabethtown and Somerville Railroad Company, or any lien whatever upon said railroad or upon any property which, by virtue of this act shall be transferred or conveyed; and provided further, that, upon such purchase as aforesaid being completed, the said· The Central Railroad Company of New Jersey shall thereby become responsible for all debts contracted by the Elizabethtown and Somerville Railroad Company, since the foreclosure of the mortgage or mortgages under which the present stockholders of said last-

named company claim to hold the said railroad, and shall be liable therefor in law and equity, in like manner as if the said debts had been contracted by the Somerville and Easton Railroad Company; provided also, that the said purchase shall be made with the consent of the last-mentioned stockholders.

The bill then further avers that, after the passage of this act, and about April 1st, 1849, the individual defendants in the bill, holding a large majority of the stock of both companies, and being directors of each, and constituting almost the entire boards, did proceed, using and proceeding in the names of said companies respectively, and assuming to act as said companies, to continue and carry out a bargain and agreement between the said two companies for the sale of the railroad and other property and appendages of the Elizabethtown and Somerville Railroad Company, and procured of Stearns & Colket, the purchasers at the master's sale, a deed conveying to the latter company all the property and appurtenances of said road as the same were conveyed by the master to them.

The two roads thus united, the name was changed to "The Central Railroad Company of New Jersey," and under that name the corporation has since carried on operations over the road and with the property of the Elizabethtown and Somerville Railroad Company.

The complainant further avers that he was and is owner of two hundred and seventy-five shares of stock in the Elizabethtown and Somerville Railroad Company, as issued anew by Stearns & Colket; that Thomas A. Hartwell and William Thompson also were and are owners of a large number of said shares, but that they neither of them gave any consent to this proceeding, but protested against the sale of their road, and still continue to protest against and resist it.

For this reason, the complainant insists that the purchase and sale made were not valid, and that all subsequent proceedings of said Central Railroad Company, in taking possession of said Elizabethtown and Somerville Railroad,

with its appendages and appurtenances, and in exercising control and dominion over them, are altogether fraudulent against the complainant and the other dissenting stockholders, and void.

Complainant then avers the existence of a large and profitable business on the road between Somerville and Elizabethtown, from the year 1846, and that a considerable surplus had been gathered at the time of the sale complained of, and that the new corporation has mortgaged all its property heavily—to the amount of one million five hundred thousand dollars—to raise money for the purpose of extending the road to Easton, an additional fraud, in the view of complainant, upon all stockholders not consenting to the sale of the Elizabethtown road.

The bill then prays—

That the defendants, viz., the directors, individually, of the two roads, the mortgage trustees, and the corporation, by whatever name rightly called, may discover and disclose the full amount of the earnings of said Elizabethtown road, from the commencement of its operations under the Stearns & Colket purchase, to the present time.

That defendants may account for these earnings. That the purchase complained of, and the bonds and mortgages, may be declared void, and of no validity whatever, and for an injunction against any further issue of any bonds or mortgages upon said road by the Central Road Company.

The Chancellor having been concerned as counsel for defendants, the matter was referred to Cortlandt Parker, Esq., one of the masters of the court, before whom it was argued.

*J. P. Bradley* and *W. L. Dayton*, for complainants.

*Frelinghuysen* and *Zabriskie*, for defendants

THE MASTER.  The questions raised by the demurrer, in this cause, are two-fold—

I. What is the proper construction and meaning of the proviso to section three of the act recited in the bill, passed February 22d, 1849 ?  Does that proviso require the consent

of *all* the stockholders of the Elizabethtown and Somerville Railroad Company, before the purchase of the road by the Somerville and Easton road becomes valid, or only the consent of a majority of said stockholders?

II. If the proviso does require the consent of all such stockholders, to constitute a valid transfer of the road, can the remedy sought be given in the present suit?

Notwithstanding the extremely able and ingenious arguments of the counsel for the demurrants, it seems to the master that the plain language of the statute in question requires the consent of all the stockholders of the Elizabethtown and Somerville Railroad Company, before the road in which they, as stockholders, have a joint ownership, under the purchase by them, and the acts of the legislature in reference thereto, can be sold and conveyed away from them.

The act, by its first section, empowers the Somerville and Easton company to buy the other road. The second section empowers the purchase, if the terms can be arranged, to pay the purchase money in their own stock, and to issue sufficient therefor. The third section makes the road, when so purchased, part of the road authorized to be constructed by the Somerville and Easton company, and extends the charter of the latter over it. It also changes the name of the consolidated company, on completion of the purchase, to that of the Central Railroad of New Jersey, and directs that all suits pending against the Somerville and Easton company shall proceed to judgment against the Central Railroad of New Jersey, and then comes the proviso which is the subject of dispute, and which has already been at length recited.

The language of this proviso is very general and comprehensive. "Nothing *in this act* contained," is its first branch, "shall in anywise affect *any right whatever*, either at law or in equity, of *any stockholder* or other person in, or any claim or demand against the Elizabethtown and Somerville Railroad Company, or any lien whatever upon the said railroad, or upon any property which, by virtue of this act, shall be transferred or conveyed." Again, says the proviso in its second

branch, "upon such purchase as aforesaid being completed, the Central Railroad of New Jersey shall thereby become responsible for all debts contracted by the Elizabethtown and Somerville Railroad Company since the foreclosure of the mortgages under which its *present* stockholders claim to hold the said road." And lastly, this branch provides the "said purchase shall be made with the consent of the last-mentioned stockholders."

What rights, then, had the stockholders of the Elizabethtown and Somerville Company at law or in equity *in* that corporation? Does a sale of the road, which was the source of all their emolument, actual or prospective, whose possession was the very condition of their actual, if not technical being, and the diversion of their capital to other employment, affect in anywise their rights? If so, by the clear meaning, almost the express words of the proviso, they had a right to dissent, and that dissent prevented the transfer permitted by the act, at any rate so far as regarded *them.* If a transfer, it did not affect the rights of the dissentient, whatever other effect it might have. I cannot divert my mind from the conclusion that a sale of their road, and the employment of the capital they invested in it to other uses, does affect the right of every stockholder in a railroad company. As stockholders, they own the road in common, to be employed in specified uses. Each owns a share in the whole, and is to have a proportionate share in its profits. They have invested a portion of their capital in it, and in it alone. They have a right in the road and in every dollar it earns. The directors are their trustees to employ the joint capital in the management of the road, and the road only, to the end that from the investment the stockholders have chosen they may reap the contemplated profits. And this is the agreement of the stockholders among themselves. They each contract with the other that their money shall be so employed. What the majority determine *within the scope* of this mutual contract, they each agree to abide by, but there their mutual contract ends, and no majority, however large, has a right to divert one cent of the joint capital to any purpose not con-

sistent with, and growing out of this original fundamental joint intention.

To sell the road, to abandon the contemplated investment and embark in another scheme, whether entirely different, or only more extensive than the original contemplation as apparent on the face of the charter, is, it seems to me, clearly contrary to the rights of the individual stockholders. If they had any right as partners or beneficiaries, it would seem to be this, that their money should be devoted to that use, and never employed in any other, nor returned to them before they desire it. The mere statement of the proposition seemed to me to prove it. No argument, however lengthened, can add to the force of the naked position.

The general principle here asserted has frequently received the sanction of the courts both of England and this country. It is the same, whether applied in the case of private associations or incorporations. "It is not, I apprehend," says Lord Eldon, "competent to any number of persons in a partnership, (unless they show a contract rendering it competent to them,) formed for specified purposes, if they propose to form a partnership for different purposes, to effect that formation by calling upon some of the partners to receive the subscribed capital and interest and quit the concern." "And again," he says in the same case, "those who seek to embark a partner in a business not originally part of the partnership concern, must make out clearly that he did expressly or tacitly acquiesce." *Natusch* v. *Irving, Appendix to Gow on Part.* 576, *Am. Ed.,* 1830. And see also the opinion of Kent, C., in *Livingston* v. *Lynch,* 4 *Johns. Ch. R.* 573. So in incorporations. Nothing is more certainly settled than that any fundamental alteration of a charter, or material deviation from or extension of a road, in the case of road companies, interferes with the rights of the corporators, and that no majority, however large, can compel any individual stockholders to submit. Thus, in such cases, if the stockholder has not paid his subscription, he is freed by such deviation from liability on his contract to do so. *New Haven and Connecticut Railroad Company* v. *Croswell,* 5

Kean v. Johnson et al.

*Hill*, 383; *Union Lock and Canal Company* v. *Towne, N. H. Rep.* 44; *Middx. T. Corp.* v. *Locke,* 8 *Mass. Rep.* 268; *Same* v. *Swan,* 10 *Mass. R.* 385. The opinions of the able judges who decided these cases, present the principle with remarkable clearness and force. The late distinguished Judge Woodbury, in Union Lock v. Towne, states the ground of his judgment thus : " Every individual owner of shares, whether a petitioner or associate or purchaser, expects, and indeed stipulates with the other body owners, as a corporator, to pay them his proportion of the expense which a majority may please to incur *in the promotion of the particular objects of the corporation.* By acquiring an interest in the corporation, therefore, he enters into an obligation with it in the nature of a special contract, the terms of which contract are limited by the specific provisions, rights and liabilities detailed in the act of incorporation. To make a valid change in this private contract, as in every other, the assent of both parties is indespensable. The corporation on the one part can assent by a vote of the majority ; the individual on the other by his own personal act. However, the corporation then may be bound by the assent to the additional acts, the defendant in his individual capacity, having never assented to either of them, is under no obligation to the plaintiff, except what he had incurred by becoming a member under the first act. *Consequently, the assessment sued for, if raised to advance objects essentially different from those originally contemplated, are not made in conformity to the defendant's special contract with the corporation.*"

It has been said that these cases do not decide the present, because they were actions brought to recover the amount of assessments or subscriptions against parties who had not paid them, and disputed their liability. But they are cited as authority, and are authority of great weight in favor of the principle that when a board of directors or a majority of stockholders deviate from the originally contemplated undertaking, the " rights " of other and dissenting stockholders are " affected," as against them they cannot legally

do it. Each of them may truly say, *"non hœc in federa vevi."* It is to this end only that they are at present adduced. They could never have been decided thus, if the courts had not been of opinion that the rights of stockholders *were* affected by any use of their invested money in a different way from that which in the beginning they intended and expected.

But the cases already cited are not the only decisions upon the point under examination. In Natusch *v.* Irving, decided by Lord Eldon, whose opinion therein has been already referred to, an injunction was granted on the application of an individual member of a company organized for the purpose of carrying on a fire and life insurance business, restraining the company from also embarking, as they intended, in marine insurance. And that was a case of great apparent hardship since the complainant was alone, and had only paid one hundred and fifty pounds to the funds, the whole capital being five hundred thousand pounds, divided among more than six hundred stockholders. In *Livingston* v. *Lynch,* 4 *Johns. Ch. Reports* 573, where a certain method of doing the business of the company was defined by the fundamental articles, and the officers, or some of them, had assumed powers not conferred upon them by these articles, though authorized by subsequent resolutions of the stockholders, Chancellor Kent, in an elaborate opinion, discusses this subject of the rights of the individual stockholders, and granted the injunction prayed for against the objectionable conduct of the officers as a material deviation from the fundamental agreement under which the stockholders had associated. In *Ware* v. *The Grand Junction Water Company,* 2 *Russ. & Mylne* 461, Lord Brougham, on the application of a single shareholder, restrained the corporation from embarking their funds and credit in getting water by aqueduct from the river Colver, instead of the Thames, as originally contemplated. In *Cunlif* v. *The Manchester and Bolton Canal Company,* 13 *Cond. Eq. R.* 131 *n.,* a corporation, on the application of a stockholder, was restrained from applying to parliament for a change in their charter, to enable them to

convert a portion of their canal into a railway, and from applying any of their corporate funds to the proposed object. And in *Stevens* v. *The Rutland and Burlington Railroad Company*, in Vermont, reported in 1 *Am. L. Register* 154, the owner of five shares out of ten thousand, obtained an injunction against the corporation's proceeding to build an extension to the originally-chartered road, against his consent, although the extension was authorized by a supplement to the charter passed by the legislature. I cite this case not to argue therefrom that such a law as was therein complained of would, unless it required the consent of all the stockholders, be unconstitutional and invalid. Whether that proposition be true or false, is not pertinent to my present purpose, and the case is simply adduced to show, additionally to the others, that a material fundamental deviation from the original idea and intention of the incorporation, affects and contravenes the rights of the stockholders.

To the same effect are, also, the following authorities: *Bagshaw* v. *E. Counties Railway Company*, 7 *Hare Ch. R.* 114; *Colman* v. *the Same*, 10 *Ch. R.* 1; *Solomons* v. *Laing*, 14 *Jurist for Dec.*, 1840, 2 *Hare Ch. R.* 461; *Preston* v. *Grand Coll. Dock Company*, 11 *Sim. Ch. R.* 327; *Solomon* v. *Randall*, 3 *M. & Craig Ch. R.* 444; *Ward* v. *Society of Attorneys*, 1 *Collyer Ch. R.* 370; *Angell & Ames on Corp.*, §§ 391, 392, 393. There is a class of cases, to some of which reference was made in the argument, apparently conflicting with those already cited, which seems to me really additional authority in support of the position already maintained. In these cases, the question was whether the alterations in, or deviations from the charter, of which complaint was made, were or were not material or fundamental. Such a case is *Gray* v. *Monongahela Nav. Company*, 2 *Watts & Serg.* 150. But it will be found that these cases admit that if the alteration or deviation, which was the subject of the suit, extended to "a change in the structure of the company," to use the forcible, but peculiar language of C. J. Gibson, in the case last cited, "it would have been fatal to the position taken by the company."

There was another case cited by counsel for defendants, as conflicting with the views here expressed : *Ware* v. *The Grand Junction Water Company*, 13 *Cond. Ch. R.* 126. The facts in that case were these : The plaintiff, a shareholder in the company sued, prayed and obtained from the Vice-Chancellor of England, an injunction against the company's devoting their capital to obtaining a supply of water from the river Colne, when their charter only contemplated the getting it from the Thames, and also against their applying to parliament for an act authorizing them to use the Colne for such a supply. On appeal, Lord Brougham, then Chancellor, sustained the injunction against the company pursuing their course before procuring such act, but dissolved it so far as regards the contemplated application to parliament. In answer to the argument based upon this case, it may be said, first, that the opinion of Sir L. Shadwell, V. C., might be well regarded as not inferior in weight, on any purely legal matter, to that of the Lord Chancellor ; and, second, that the ruling on the appeal admitted that, without a new act, the contemplated change in the original idea of the company, did affect the rights of the stockholders, and thus the case corroborates those already alluded to. Until it was seen what act parliament would pass, and what conditions it imposed upon the company, the Chancellor might properly think it wrong to interfere. If the new act, like the one in question in this cause, provided for the saying of the rights of all the stockholders, no objection to it could possibly be taken ; and, besides, after the actual passage of the projected act, it might be that the stockholders would all consent, which would at once do away with all question.

But it is contended on the part of the defendants, that by the sale of their road, no rights of any stockholder in the Elizabethtown and Somerville Railroad Company are affected ; that the majority of stockholders have the power and the right, at any moment, to sell all the property of the corporation and quit business. And that if they pay over to him the profits of the business while it is carried on, and his proportionate share of the proceeds of sale, the "rights"

of every stockholder are satisfied, and he can claim no farther at law or in equity.

I answer, first, if this be so, the proviso in question was singularly useless and uncalled for. No act on the part of the legislature was necessary to protect their rights. They might most safely have been entrusted to the care of this or the other courts. But, without dwelling on this observation, is the doctrine contended for true? Is it the law that a majority of stockholders in any corporation, however prosperous its business affairs may be, can, at their own mere caprice, sell out the whole source of their emoluments, invest their capital in other enterprises, and that, however the minority may desire the prosecution of the business in which they had engaged, they have no injury to complain of, at law or in equity, so long as they obtain their proportion of the proceeds of the sale?

On principle, this position seems to me unsound. If it be true, a minority is entirely in the power of a majority, and the moment a rich man or a few rich men see what they deem a better investment for their money than the corporation in which they are already stockholders, they may compel the poorer members of the company to abandon profits satisfactory to them, and either risk the little they have, according to views from which they differ, or take back their money to lie profitless on their hands, until they find another investment. Or, more nearly to approach the case in hand, as asserted by the complainants, if a rich man, or a number of rich men possess a controlling interest in two roads whose termini meet—one already successful, the other not built, or needing nursing care—they may compel the poorer stockholders either to abandon or postpone the profitable use of their share of the capital, or take back their money and give up an investment which perhaps their own enterprise suggested, and their own perseverance recommended to the attention of others, and hazard the finding of a new investment, and a repetition of the same destruction of it. If such were the law, corporations would soon be few, for seldom would capitalists, whatever their comparative wealth,

invest in enterprises so readily rendered profitless at the caprice, or in obedience to the interest of any man or set of men rich enough to control the majority of stock.

That the majority should have the power claimed for them, does not seem to me to be the contract between the stockholders, for there *is* a contract, as already shown in the case of every corporation, between them. That contract is, that their joint funds shall, under the care of specified persons, generally called directors, be employed, and that for certain specified purposes. Sometimes the duration of such employment is limited in the charter, and then, until that time, it must continue so employed, unless, perhaps, in case of clear loss. Sometimes no time is fixed by the charter at which the proposed use of the capital shall cease, and then the contract between the parties is that, so long as the affairs of the company are prosperous, it shall go on, unless all consent to the contrary. The charter of the Elizabethtown company defines no period for its expiration; it is, however, such a corporation as naturally must, at its origin, have been expected to continue permanently, and by one section of its charter, it is provided that at the end of fifty years from its completion, the state has the right to take the road at an appraisement, a provision which may have been one reason for the privileges conferred. The charter bears date February 9th, 1831, and there was, of course, at the date of the act of 1849, a long period to elapse before the half century expires. True, the present stockholders are not the originators of the road, nor do they claim by transfer of stock from the original holders; but, nevertheless, by the act legalizing the mortgage of the franchise and property, the purchasers at the mortgage sale were substituted to all the chartered rights of the first owners of the stock, and the charter is still the only evidence of the character of their contract. It must be inferred, then, that they, like the first stockholders, expected and embarked their means in the enterprise, on the faith that it was to continue, if prosperous, at least till the fifty years elapsed.

It can hardly, therefore, I think, be argued with justice,

that a majority of the stockholders had a right, upon principle, to sell out all the property of the company from which its profits were to be realized and abandon the business, and that the minority's rights are satisfied by a division to them of the value of their stock.

Nor does the only case cited on the argument—*Revere v. The Boston Copper Co.*, 15 *Pick.* 351—substantiate any such position as that contended for by the counsel for defendant. The defendants in that case were a manufacturing corporation. Their business had become unprofitable, and a majority of the stockholders had voted to wind up its affairs.

The plaintiff, who was a corporator, had also been an agent for them, under a contract for his employment indefinitely, without any limit except his death; and he sued for damages accruing by reason of their refusal longer to employ him. The question in the cause was, whether the proceedings taken were a dissolution of the corporation, and whether, after them, the plaintiff could sue on his contract. These questions were decided for the plaintiff, but in their opinion, the court, *arguendo*, replied to a suggestion by defendant's counsel to the effect that the plaintiff being himself a member of the corporation, was bound by its acts, and that since a majority had voted to dissolve and wind up, he was bound by it, though he individually dissented. The court said that this argument could not be sustained. "So far as his rights, duties and obligations as a corporator were concerned, no doubt he is bound, but no farther."

Giving the strongest right to this dictum of the court, as applied to the case before them, it is not, I think, in point here. That was a case of a manufacturing corporation, and, therefore, not originally to be expected to be of so long duration as a corporation for the establishment of a public road, which was clearly expected to be in operation at least fifty years. And what, perhaps, is more to the present purpose, the scheme of the Boston company had proved a failure. Here the bill asserts and the demurrer admits that the Elizabethtown Road Company was, at the date of the pur-

chase complained of, eminently prosperous, which is the very gist of the injury alleged to be done to the complainant. For can this general language of the court just cited, be of importance, since the question still remains, what are the "rights, duties and of obligations of a corporator?" The complainant in this cause claims not as a corporator, but as an individual contracting with other individuals, all together forming the corporation. The contract is, we will jointly carry on the enterprise projected, and no other; and in carrying it on, the majority shall rule within the terms of our fundamental agreement. But there is no contract that the majority shall have the power to stop carrying it on, and that while it is profitable. And the case in Pickering is expressly to the effect (p. 363,) that the votes and acts of a corporation cannot deprive the plaintiff of rights belonging to him as a contractor with the corporation. On this point see also the opinion of Judge Woodbury, already cited.

It may, indeed, be true, as urged in the argument, that corporations have a right to sell their property not limited by quantity; and where they sell, as they buy, for corporate purposes, a court of equity would not, without other circumstances, restrain them. But on the other hand, to cite the language of a learned author, "how far, under what circumstances, and upon what application a court of equity would restrain a corporation from an improper alienation of its property, must depend upon the general principles which guide it in the exercise of its powers; but there is little doubt that in a proper case made, it would interfere to prevent a disposition of its property *for other than corporate purposes*. *Angell & Ames, p.* 190, referring to *Binney's case,* 3 *Bland.* (*Md.*) *Ch. R.* 142. And the opinion of Lord Eldon in Natusch *v.* Irving, is expressly in point, unless there be a difference in the rights of partners in a joint stock association and in a corporation. In that case, the defendants had offered to pay back all that the orator had paid into the company, with interest, and also fully to indemnify him against all loss by the transactions of the company in the business which was beyond the original articles. Lord Eldon

to this part of the case replies in substance, as already stated, that it is not competent for any number of persons in a partnership (unless so provided for) formed for specified purposes, to affect that formation by calling upon some of the partners so receive back their capital stock and interest, and quit the concern, which, in effect, would be merely compelling them to retire upon such terms as should be dictated to them, so as to form a new company; and he further says that "*it is the right of a partner to hold his associates to the specified purposes whilst the partnership continues,* and not to rest upon indemnities with respect to what he had not contracted to engage in; and that a partner cannot be compelled to part with his shares, though for double what he originally gave for them; and that it may be his principal reason for keeping them, to have the partnership carried on according to the original contract." If a majority of partners, corporate or unincorporate, can sell out all their property and satisfy the rights of a dissenting partner, by a simple payment to him of his share, they "*can* compel him to retire," and "form a new company," and utterly evade and set at nought his "right to hold his associates to the specified purposes," and *can* "compel him to part with his shares" at any sum they choose.

It is again urged, on the part of the defendants, that the very enacting section of the charter of the Elizabethtown company gives to the corporation the power of selling and conveying all their property, and that, as this charter is the fundamental contract between the stockholders, the complainant has himself agreed to give to the corporation, and, of course, to the majority, the power of selling this road and all their property whenever they choose. The words in section first relied upon are these : " And they " (the original corporators) "and their successors, by the said name and style," (meaning the corporate name just before mentioned,) "shall be capable of purchasing, holding and *conveying* any lands, tenements, goods and chattels whatever, necessary and expedient to the objects of this incorporation." Now, it is argued, the company have, by this language, the power to

convey away all they have the power to purchase and to hold.

The argument seems to me more plausible than sound. Admitting that the words used have any greater force or wider meaning than that the corporation should buy, hold and convey *by that name*, the whole argument falls by simply restating, in terms, the propositions contained in the words cited. They are these : that the corporators and their successors should, by their corporate name, be capable of purchasing any lands or goods necessary or expedient to the objects of this incorporation ; that is, when it is necessary to the objects of the incorporation that it should purchase or hold any particular property, it can do so ; when it is necessary or expedient to *the objects of the incorporation* that it should convey any particular property, it can do so. So that it is only when the objects of the incorporation require it that any lawful conveyance can be made. Can it be pretended that the objects of the incorporation require that the necessary source of its profitable existence should be sold and conveyed away ?

There is nothing, I think, therefore, in principle or authority, to shake the conclusion already arrived at, that the sale of this road by the Elizabethtown and Somerville Railroad Company, at a time when its affairs were eminently prosperous, did affect the rights of its stockholders ; that they had the right to retain their investment where it was, and as it was, and that their rights are not satisfied by a payment to them of their proportion in the proceeds of such sale.

But the real character of this purchase was such as to bring it precisely within the decisions already quoted. In form, it was a sale of the road ; in fact, it was an extension of it—an addition to the originally proposed scheme. The franchises of the company have not in form been destroyed. They may be said to be in a state of suspended animation, and the road is governed by a newly created corporation, composed by the union of two previously existing ones ; and this consolidated company carries on two enterprises as one,

which before were the several tasks and privileges of the originally created corporations. The case is, therefore, almost precisely that adjudicated in Stevens *v.* The Rutland and Bennington R. R. Co., The Hartford and N. H. R. R. Co. *v.* Cresswell, and The Union Lock and Canal Company *v.* Towne, already cited to show that a deviation from the charter or fundamental articles of association affected the rights of the stockholders. Indeed, in the last-mentioned case, the supplementary act placed one company under the charter of the other, just as, in this case, the road sold becomes a part of the Somerville and Easton Railroad Company, and its further maintenance, use, and enjoyment is regulated and governed by the provisions of the last-named company's charter.

If, then, the purchase authorized by the act of 1849, supplementary to the charter of the Somerville and Easton company, did affect the rights of the stockholders in the Elizabethtown and Somerville company, it seems to me to follow, necessarily, that the legislature intended, when they provided that nothing in that *act* contained should in anywise affect any right whatever, either at law or in equity, of *any* stockholder in the Elizabethtown and Somerville Railroad Company, that such purchase should not occur without that which alone could prevent its affecting such rights, viz., the *consent* of every stockholder. Their language is, buy, but see that you buy in such a manner as not to affect the right of any stockholder. And as buying will affect those rights, unless the stockholder consents to the sale, that consent is required. And such a conclusion seems entirely clear from the subsequent language of the same section almost immediately following. It proceeds to provide that the Central Railroad Company shall, on the completion of the purchase, become responsible thereby for all debts contracted by the Elizabethtown and Somerville company since the foreclosure of the mortgages under which its *present* stockholders claim to hold the said road, and closes with these words: "Provided, also, that the said purchase shall be made with the consent of the last-mentioned stockholders."

Now, the "last-mentioned" stockholders are the *present* stockholders, since the foreclosure of the mortgages, of the Elizabethtown and Somerville Railroad Company. And the plain meaning of the legislature seems to me to be expressed by putting the two clauses together, thus, "nothing in this act contained shall in anywise affect any right whatever, in law or in equity, of *any* stockholder in the Elizabethtown and Somerville Railroad Company; and such purchase shall be made with the consent of such stockholders, that is to say, the *present* stockholders of said company." The first clause of the proviso had, in effect, required the consent of all the stockholders of the company selling, to the sale, but it had not, it was thought, clearly designated what stockholders. It seems as if the insertion of the intermediate proviso brought this to mind, and thereupon were added the words which defined that the consent already impliedly required of all the stockholders, should be given by all the *present* stockholders, in contradistinction to those who owned the road prior to its sale under the foreclosure.

I cannot agree with the position taken by the counsel for defendants, that this proviso only refers to the enactments contained in the section in which it is used, and not to the act in general. Its first clause refers, in terms, to the whole act. "Nothing in *this act* contained," &c., and it would, to my mind, be an overstrained conclusion from any rule for the construction of statutes, to make the last clause apply only to the section in which it is found, because it did not repeat an express reference to the whole act. Nor is there any reason for so doing. There have been many rules laid down by great lawyers, for construeing statutes, but they are reducible to one—find out the *intention* of the legislature. The two succeeding provisos follow, and hang upon the first, and there is not a reason for applying the third proviso to the enactments contained in that section, which does not apply as strongly in favor of extending it to the whole act.

In the view I have taken of this act, it is entirely unnecessary for me to enter upon the interesting question so ably discussed by counsel on either side, whether the act would

not be unconstitutional because impairing the obligation of contracts, unless it provided for the consent of all the stockholders. It is a question of too much importance needlessly to be approached. The intention of the legislature, in the law under examination, seems clear, and it is not for me to volunteer an opinion indirectly bearing upon the rights of many parties not litigant here.

Nor, for the same reason, will it be necessary for me to discuss or decide another point raised on the argument, to wit, that, if an act authorizing any deviation from the original charter, and not requiring the consent of all the stockholders, be unconstitutional, then the supplement under which the complainant and all the stockholders hold who claim under the mortgage sale, is unconstitutional and invalid, because that act legalized the mortgage of the franchises of the corporation on the consent of only two-thirds of the stockholders; and therefore the complainant has no right in this court. It is enough to say this act does require the consent of all; and it does not lie in the mouth of the defendants to impugn the title under which both they as well as the complainant hold. They were joint owners with him, and they have no right to take all, and then contend that neither he or they had any right. They were trustees for him, and they cannot dispute their contract to deal with him as a beneficiary, and keep everything to themselves.

Another point was made by counsel for defendant, to which it is proper that I should allude. It is that this act of 1849 is one instance of the exertion by the legislature of the right of eminent domain, the taking private property for public use, on making just compensation therefor.

If I have rightly viewed the subject, the doctrine of eminent domain has no application to the case. The act of 1849 has nothing in common with the statutes under which property is taken for public use. It does not authorize the Easton Road company to take, but only to buy the road belonging to the Elizabethtown company. It does not provide for any compensation, or any means of estimating what

shall be just. No commissioners are provided for—no appeal given to a court or a jury. The law simply confers new powers upon the Easton company—that is, to buy out the other; and if they cannot bargain to pay in stock, issue enough to do so, and without in terms conferring any power on the Elizabethtown company to sell, provides, as I read it, that if they sell, it shall be in such a way as not to affect any right of any stockholder, but with their consent. I cannot see in all this any ground for mooting the doctrine of eminent domain.

Again, it was urged on the argument that there are various acts on the statute book, supplementary to charters of other companies, in which material deviations from their original enterprises were authorized, without requiring the assent of all their stockholders respectively, and hence it was argued that the legislature did not intend to require by this act that assent. One of the acts to which reference was made, required only the assent of the company under the corporate seal; another of seven-eighths of the stockholders; another two-thirds of three-fourths; and still another of a majority of the stockholders, while other acts cited required no assent at all.

To examine and decide upon the intention of the legislature in each of the acts, would be entirely beyond my duty at the present time. It is enough to say that each of these acts had its peculiar object, and that the intent of the law-makers was different in each. No argument can therefore be rightly drawn from them to bear upon the present case. No such language as that in the act under review is contained in either of them. And if the legislature, when intending to require the consent of a majority of the stockholders only, did, as in one of the acts referred to, expressly say so, perhaps the fair inference would be, that if, by the act under review, they had intended to require no more, they would have said so in terms again.

I have thus disposed of the first and main topic of discussion in this cause—the proper construction and meaning of the proviso in the act of 1849. I am satisfied, and do so

with great respect, report to and advise the Chancellor that the proviso requires the consent of all the stockholders of the Elizabethtown and Somerville Railroad Company before the purchases authorized by that act becomes valid.

Another topic still remains.

II. Admitting this consent of all the stockholders to be necessary, can the remedy sought to be given in the present suit?

The objection is, that the Elizabethtown and Somerville Railroad Company has not been made a party to this bill, and that until they are parties, the complainant is not entitled to the relief prayed.

The parties defendant are the directors of both roads, the same individuals to whose action is ascribed the injury complained of, and the Somerville and Easton Railroad Company who, with full knowledge of the illegality of their proceedings, are now in possession of the road, the personal property, every thing belonging to the complainant's company, except the naked franchise.

And he prays—

1. A discovery of what they have done in regard of this purchase.

2. The amount of the property and net earnings of the Elizabethtown company since the foreclosure sale.

3. An account by said defendants with the complainant, his company, and all the stockholders, respecting said property and earnings.

4. A discovery as to the bonds and mortgages.

5. A decree that the purchase, sale and mortgages are invalid and void.

6. And an injunction against any further issue of bonds and mortgages, pledging the road of the Elizabethtown company.

I cannot see that the Elizabethtown company is a *necessary* party in order to any one of the different kinds of relief here prayed. A proper party they might be, and companies sustaining their position are in fact made defendants to every case at all resembling the present, to which I have re-

ferred. But the bill is directed against the directors, as individuals, for breach of trust, and against the Easton company as recipients of the trust property, with knowledge of the alleged wrong. The Elizabethtown company may be interested as a corporation in sustaining the validity of the alleged sale, but the complainant properly seeks his discovery and account from those who, he alleges, have taken his property and applied it to other purposes than those to which, according to the charter, it was to be applied. All the real parties are already defendants; formally, it might have been better that the Elizabethtown company should have also been brought in. The case of *Solomons* v. *Laing*, 14 *Jurist*, is much in point here. There the question was, whether the company who had reaped the benefit of a similar transaction was a proper party. And the court held they were *the* proper party, jointly with the individual directors. In that case the complainant's company were the defendants, but no relief was prayed against them except costs.

There is no demurrer here for want of parties. The objection was not taken till the hearing of a general demurrer to the equity of the bill. In such a case the rule is, that where the omitted parties are merely formal, the court will be indisposed to listen to the objection at the hearing, and if it can properly do so, will dispose of the cause upon its merits, without requiring such formal parties to be joined. *Story's Eq. Pl.*, *p.* 542.

It seems to me that this is a case within the rule, and that there is no reason why the cause should not be disposed of upon its merits, though the Elizabethtown company has not been brought in as a defendant.

Upon the whole case, I respectfully report to and advise his Honor, the Chancellor, that the demurrer of the defendants be overruled, with costs.

CORTLANDT PARKER,
*Master in Chancery.*

CITED *in Zabriskie* v. *Hackensack & N. Y. R. R. Co.*, 4 *C. E. Gr.* 184; *Black* v. *Del. & Rar. Can. Co.*, 7 *C. E. Gr.* 192, 196, 215, 404.