The two principal questions in this case are: first, Whether the sale of the Hartford, Providence, *Page 261 
and Fishkill Railroad to the Boston, Hartford, and Erie Railroad Company was illegal; and secondly, if so, whether the complainants are still entitled to enforce their rights against the defendants, whose title is founded upon that sale.
The complainants claim that the sale was void because it was beyond the power of the corporation to make it, and also by reason of false and fraudulent representations, and of certain conditions precedent to the transfer of the title which were not performed.
Was the sale ultra vires?
That a corporation, as a creature of the legislature, can possess and exercise "no other powers than those specially conferred by the act creating it, or such as are incidental or necessary to carry into effect the purposes for which it was created," Caldwell v. City of Alton, 33 Ill. 416, 418; that it cannot of its own motion absolve itself from its obligations by transferring its franchise to another; Thomas v. RailroadCompany, 11 Otto, 71; and that it cannot by a vote of a majority of the stockholders arbitrarily deprive a minority of their interest in its property and practical existence, Kean v.Johnson, 9 N.J. Eq. 413, are propositions too plain to be disputed.
It is apparent from the record in this case that the Hartford, Providence, and Fishkill Railroad Company had no authority, at the time when the contract was made, to sell or to lease to the Boston, Hartford, and Erie Railroad Company; that the agreement of sale, by transferring all the property and business of the corporation, was a practical abandonment of the charter and dissolution of the company; and that this was done by a vote which, if valid, compelled all stockholders to accept stock in another company in lieu of that in the Hartford, Providence, and Fishkill Railroad Company, or a fixed and arbitrary sum for such stock, which after the sale of the road could have no value except under this agreement.
Certainly up to this point the transaction was ultra vires,
both from the lack of legislative authority, and from the unwarrantable manner of undertaking to dispose of the rights and property of non-consenting stockholders.
But the transfer and sale by the corporation were ratified and *Page 262 
confirmed by the General Assembly of this State, March 2, 1865, and we have therefore to consider the effect of this action.
The Boston, Hartford, and Erie Railroad Company was chartered by the State of Connecticut, and was not a Rhode Island corporation, except so far as it became, by virtue of the sale and the action of the legislature, the successor of the Hartford. Providence, and Fishkill Railroad Company.
Yet as a foreign corporation it might be empowered to own and operate a railroad within this State, the policy of such authority being wholly within the discretion of the legislature.State v. Boston, Concord Montreal R.R. Co. 25 Vt. 433; Inthe Matter of Townsend, 39 N.Y. 171; Stewart v. Lehigh ValleyR.R. Co. 38 N.J. Law, 505; Thompson v. Waters, 25 Mich. 214;Hall et al. v. The Sullivan Railway, 21 Law Reporter, 138; 2 Redfield Amer. Railway Cases, p. 621.
But the Boston, Hartford, and Erie Railroad Company can hardly be regarded as a foreign corporation. True it was not a Rhode Island corporation in the sense that it was chartered here; but it was subject to Rhode Island laws and control as fully as a domestic railroad company. Its petition for confirmation of the sale was that it might "hold and enjoy said property and franchises by them purchased, subject to the charter of said Hartford, Providence, and Fishkill Railroad Company and the general law of this State;" and the act of the General Assembly provided that it might have and enjoy "all the rights, privileges, and powers heretofore granted to the Hartford, Providence, and Fishkill Railroad Company, and be subject to all the duties and liabilities imposed upon the same by its charter and the general laws of the State."
After this legislative action, therefore, the Boston, Hartford, and Erie Railroad Company was successor to the franchise of the Hartford, Providence, and Fishkill Railroad Company, with no new nor greater powers, and subject to the same obligations and control. It was thenceforth a corporation in this State, though not of this State. Chicago W.I.R.R. Co. v.Lake Shere M.S.R.R. Co. 11 Reporter, 323, issue of March 9, 1881.
Hence, whether it was a foreign or quasi domestic corporation the grant of corporate rights and privileges to it was within the *Page 263 
power of the legislature, and to that extent, at least, the confirmation of the sale was valid and effectual.
But the sale was of the whole business and property of the Hartford, Providence, and Fishkill Railroad Company. After it, nothing remained to them but the mere franchise to exist as a corporation. It was not an extension of business or engaging in a new enterprise by the company; everything of value and utility was sold; and that not for a sum to be divided proportionately among all the stockholders, but under an arrangement by which the minority were told that they could either take stock in the Boston, Hartford, and Erie Company, or money, on a fixed basis, not agreed to by them, or they would get nothing.
Such an arbitrary deprivation of property it cannot be within the power of a majority in a corporation to direct or of a legislature to ratify. If this could be upheld no investment in a corporation would be secure, for any minority could be deprived of their property by a vote of a majority confirmed by legislative act, without the requirement of public necessity and without provision for "just compensation." Lauman v. TheLebanon Valley R.R. Co. 30 Pa. St. 42.
We do not say that there may not be cases where a majority of stockholders may lawfully vote to sell all the company's property and surrender their charter; e.g. "where the purpose of the incorporation could not be accomplished; the business contemplated could not be carried on; where the capital had been exhausted in endeavors to go on, leaving no means to go further,"c. Wilson v. Proprietors of Central Bridge, 9 R.I. 590, 598.
But such is not this case. Though we may well assume that the Hartford, Providence, and Fishkill Company was embarrassed from the fact that the road was in the hands of trustees for default in the payment of interest due on its mortgages, and from testimony that its stock was selling for a nominal sum, yet the sale does not purport to be made by reason of the financial exhaustion of the company, but for the purpose of promoting the extension of the road, not in this State, but "so as to connect it with the Erie Railroad at Fishkill on the west."
It is urged, however, that though the arrangement partook of *Page 264 
this arbitrary character, the complainants were not injured by the transaction because they were to be paid ten times what their stock was worth at the time of the sale. Perhaps they were, but if so, it was an act of such pure and unusual generosity that it is not at all strange that we cannot quite satisfy ourselves upon that point. Calvin Day, the president of the Hartford, Providence, and Fishkill Railroad Company, testifies: "The argument of the gentlemen representing the Boston, Hartford, and Erie Railroad Company was, that having obtained the road from Waterbury to Boston and Providence at so low a price, incomparison with its cost or value, the consolidated property would be sufficient to enable the company to float bonds at a reasonable price," sufficient to complete the road to Fishkill; "and in pursuance of that they subsequently issued $20,000,000 of bonds."
True, the importance of this testimony as showing the real value of the property is somewhat impaired by the subsequent remark of the witness in regard to those bonds, that "there was a great crop of fools at that time," but it nevertheless leads us to believe that there was an apparent value in excess of the stock and money to be given for it which the owners were at least entitled to ascertain and be paid for.
Upon the facts before us, therefore, we cannot doubt that this sale would have been set aside, or in some way reformed, upon a seasonable and proper showing by the non-consenting stockholders. They were then in part the owners of the road. The fact that it was in the hands of trustees could not have affected their right to be heard before the court as to its permanent alienation: they had a clear interest in the affairs of the company, in its property and existence; and though they could not have brought this bill to redeem the mortgages not then due, they could have objected to and settled the validity of the sale which disposed of all the corporate property and business, and thereby have determined the real question in this case before the rights of other parties had intervened. We think they should have done so. The question in this case is not whether the complainants have been negligent in seeking to redeem the mortgages, but in objecting to the sale, on the rescission of which their right to redeem depends. It is admitted that they knew of the sale *Page 265 
and the terms on which it was made. Nearly three years afterwards the Boston, Hartford, and Erie Railroad Company proposed to raise money by the Berdell mortgage, so called. Those who desired to take the bonds found that company claiming the ownership of the Hartford, Providence, and Fishkill Railroad, under the deed given pursuant to the contract of August 28, 1863, which was recorded in the land records of the city of Providence in December, 1863; that no one had made any question of the legality and validity of that sale; that it was acquiesced in, at least by their silence, by the stockholders of the Hartford, Providence, and Fishkill Railroad Company; that it was ratified and confirmed by the General Assembly of this State after ample notice and opportunity to object to it; that the mortgage itself was also allowed and confirmed by the legislature, so far as appears, without opposition; that the Hartford, Providence, and Fishkill Railroad Company had ceased to hold corporate meetings, and had virtually passed out of existence — and, with these facts before them, they took the bonds under that mortgage.
Right here is the decisive point in this case, for upon that mortgage the defendants' title rests. We think that under these circumstances the complainants are equitably estopped from claiming that the sale should be set aside.
It is a well settled rule of law that where an unauthorized sale of property is expressly or impliedly sanctioned by the owner, he is precluded from subsequently setting up his title against the purchaser. Acquiescence is an implied sanction of the sale.
In Wendell v. Van Rensselaer, 1 Johns. Ch. 344, 353, Chancellor Kent says: "There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man, knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel. Quitacet, consentire videtur. Qui potest et debet veture, jubet." And see the cases there cited. "Though the right of the party who thus misleads *Page 266 
third persons by his silence be merely a reversionary interest, subject to a life estate in the person whom the suffers to act with the property as owner, yet, as appears from several of the cases, the application of the principle is the same."
The complainants, with full knowledge of the facts, standing by, and without objection allowing the bonds of the Berdell mortgage to be taken, and large sums to be invested upon the faith of its validity, would clearly, by reason and justice, be estopped from denying its validity afterwards. For a much stronger reason, after a lapse of twelve years, when large additional amounts have been invested and expended in the enterprise; when those bonds have passed from one to another with the increased confidence and security which those years of silence on the part of the complainants have warranted; when the property has passed under the mortgage to a new corporation, including, doubtless, at the filing of this bill, still other new and different stockholders, it would be manifestly unjust to set aside all these proceedings in behalf of the complainants, who might have enforced their rights before any of the bonds were put upon the market. These remarks apply equally to the holders of "common" and "preferred" stock.
In Peabody v. Flint, 6 Allen, 52, it was held that a delay of three years and a half by a minority of the stockholders in a railroad company to complain of a mortgage which they claimed had been fraudulently issued forfeited the right to equitable relief. Chapman, J., remarked, p. 57, that "in the mean time the stock in the corporation must have been frequently changing hands, and there are no means of adjusting the equities growing out of such changes;" and, p. 58, that "a decree such as they now seek may injuriously affect many persons who have become stockholders or bondholders during the period of this delay."
See, also Royal Bank of Liverpool v. Grand Junction R.R.125 Mass. 490.
Strongly in point is the case In re Pinto Silver Mining Co.
L.R. 8 Ch. Div. 273.
The petitioner was a creditor of the Pinto Company under a mortgage given to trustees. The company voted to wind up by voluntary liquidation, and to sell all its property subject to the *Page 267 
existing mortgage debt. The liquidators made a contract to sell, followed by an ordinary conveyance, free from incumbrances, to another company, composed almost entirely of stockholders of the Pinto Company, with an arrangement that creditors of the old company should take the bonds of the new company in lieu of the mortgage security. At a meeting of the mortgagees a large majority approved of the contract, and took the bonds of the new company accordingly; but though the petitioner knew of these proceedings, he took no part in them and never released his debt, nor did the trustees under the mortgage make any transfer to the new company. After three years the petitioner claimed that there had been no legal dissolution of the company, because there had been no legal sale of the property, and that he did not know that the liquidators had departed in the conveyance from the terms of the vote until just before he filed his petition. Hall, V.C., decided that as to the petitioner and other unsatisfied creditors the company was not legally dissolved; but, on appeal, this decision was reversed upon the ground that the petitioner was estopped from disputing the validity of the dissolution by reason of his acquiescence for three years.
James, L.J., says, p. 284: "I am of opinion that the petitioner is estopped from disputing the validity of the dissolution. . . . When a person, having knowledge of what is being done, assents by his trustees to the transfer of the property of the company to another company, being aware that the former company was in course of winding up, and takes no step during the whole of that winding up, it is utterly out of the question that he should be at liberty to come after the lapse of years and upset all that has been done."
To the same effect Cotton, L.J., says, p. 285: "Moreover, the petitioner has substantially been aware of all that has been done; he knew that the property was to be transferred to the other company, and that a final meeting was called to consider the liquidators' account. After having thus lain by, he cannot now come to have the proceedings ripped up."
But the complainants claim that the sale was void by reason of fraud and misrepresentation on the part of the Boston, Hartford, and Erie Railroad Company, and that their suit was brought *Page 268 
as soon as they discovered the fraud. While few, if any, of the transactions of that company which have been brought to our attention are remarkable for simplicity and plain dealing, we do not find such convincing proof of fraud in this case as to warrant our proceeding upon that ground.
There are three fraudulent representations claimed by the complainants:
1. That the indebtedness of the Southern Midland Railroad Company, including the cost of completing the road, should not exceed $1,000,000; but at the hearing this was expressly waived as a representation, though not as a condition. We do not think, however, that it was a condition, but rather an estimate, or, as it is termed in the contract, an "understanding and agreement."
2. That the stock subscription of $5,000,000 was subsequently cancelled.
This was indeed a peculiar transaction, not altogether above the suspicion of intentional misleading; yet we cannot say that it was a fraud. The contract provided for the purchase of the Southern Midland Railroad and the franchise of the Thompson and Willimantic Railroad Company for 50,000 shares of stock, or $5,000,000. The owners of these roads were subscribers to the Boston, Hartford, and Erie Railroad Company; hence, by turning over the road, they virtually paid for the 50,000 shares, and were entitled to have their subscriptions cancelled. It could have made no difference if they had paid that amount in cash for their stock, and then received it back from the company for the railroads, at the agreed price. True, the complainants may have supposed that the subscription was to be paid in cash as capital for the company, in addition to the purchase of the railroads for stock; but there is no such provision in the agreement, and we cannot therefore find that there was such a representation or condition.
3. That thirty-five eighty-fifths of the additional stock issued was not put into the hands of trustees pursuant to the agreement.
Clearly this cannot be held to be a condition.
If under the agreement the trustees were entitled to receive additional shares of stock they could have compelled its issue; *Page 269 
indeed there seems to have been little reluctance on the part of the officers of the Boston, Hartford, and Erie Railroad Company to issue stock, and it does not appear that it was ever demanded by the trustees. Even if it were fraudulently withheld, this could not operate to invalidate a title which had previously passed under a conveyance.
The complainants urge that the New York and New England Railroad Company cannot be regarded as an innocent purchaser, because it took the property with notice of their claims. It is true that the decree approving the deed from the trustees under the Berdell mortgage contains a provision that nothing therein contained "shall at any time be construed to affect or impair in any way or manner the rights of any person or corporation claiming to hold stock, whether common or preferred, in the Hartford, Providence, and Fishkill Railroad Company, or of any person or corporation not party to this suit." This is quite vague as a notice to a purchaser, but it is to be remembered that the stockholders of the New York and New England Railroad Company were not then buying the road; they were already the owners of it by virtue of being bondholders, and were simply taking the legal title to themselves. The mortgage, and not the deed, was the foundation of their title, and it is not claimed that the bondholders had any notice of a disaffirmance of the sale. But, assuming that the provision in the decree was a notice, what could the purchasers have ascertained if they had undertaken to investigate the matter? Could they have found that the alleged ownership of the Boston, Hartford, and Erie Railroad Company had ever been disputed? that anything had been done to set aside the sale, or that "any person or corporation claiming to hold stock, whether common or preferred, in the Hartford, Providence, and Fishkill Railroad Company" had in any way, during the twelve years, shown any dissent, otherwise than by the fact that some had not taken pay for their stock? Was there any notice that the complainants had ever made or intended to make any claim of ownership in the property? Then too this was in 1875, twelve years after the sale, when the mischief arising from acquiescence and delay had already been occasioned. Therefore whatever effect might be given to the notice, if it were necessary to *Page 270 
pass upon it, it is clear that it came too late to do any good to the purchaser, or to save the rights of the complainants.
The decree for the deed from the assignees of the Boston, Hartford, and Erie Railroad Company contained a similar reservation, but that is unimportant, as that decree was subsequent in date, and the conveyance simply ancillary to the title under the mortgage.
We therefore conclude that although there was a voidable sale of the property in question, it cannot now be set aside for the complainants by reason of their acquiescence and delay; that there is no proof of fraud, the recent discovery of which would entitle them to relief; that the stipulations in the agreement above referred to were not conditions precedent to the passing of title, and that the New York and New England Railroad Company is not affected by the reservations in the decrees of 1875.
MATTESON, J., concurred.